hGREMILLION, Judge.
The defendant, Harry Vicknair, appeals the judgment of the workers’ compensation judge denying his request for surgery. For the following reasons, we affirm.
FACTS
Vicknair suffered a work-related injury to his lower back, left knee, ankle, and foot on June 19, 1996, while employed as a maintenance man for the plaintiff, Yoo Hoo of Louisiana. Diagnostic tests revealed bulging discs at the L4-5 and L5-S1 disc levels, along with narrowing of the neural foramina. Dr. Douglas McKay, an orthopedic surgeon, who has treated Vick-nair since November 1997, recommended surgery after conservative treatment failed.
On May 10, 2000, Yoo Hoo filed a disputed claim for compensation alleging that Vicknair refused to undergo an examination for a second opinion and to submit to a functional capacity evaluation (FCE). Vicknair disputed the need for an FCE, alleging that it was unnecessary since Dr. McKay did not feel he had reached maximum medical improvement (MMI). Thereafter, Yoo Hoo filed a motion to compel Vicknair to submit to a second medical examination by Dr. Jack Hurst, a neurosurgeon. The workers’ compensation judge ordered the medical examination, which was performed on November 15, 2000.
A trial on the merits was held on February 15, 2001. The only issue considered by the workers’ compensation judge was whether the surgery recommended by Dr. McKay was reasonable or necessary. After taking evidence, the workers’ compensation judge ordered Vicknair to undergo an FCE so that she could ^consider its results in determining whether to grant the request.
The FCE was performed by New Day Rehabilitation on March 3, 2001. The FCE report stated that objective data from the evaluation suggested that Vick-nair did not perform at his maximum capabilities and his validity was unreliable in nine tests. It further placed him within the sedentary work category, but stated that:

It should be noted that this PDC level is questionable and not a true indication of Mr. Vicknair’s maximum abilities secondary to evidence of submaximal effort presented in this evaluation. If Mr. Vicknair had performed at his maximum level, he may have qualified for a higher physical demand level, but at this time it is unknown as to what his maximum capabilities are.

On March 16, 2001, the workers’ compensation judge issued a judgment finding that the surgery recommended by Dr. McKay was neither reasonable nor necessary, due to the questionable validity of Vicknair’s complaints. She further held that vocational rehabilitation was necessary and ordered Vicknair to cooperate with Yoo Hoo’s vocational rehabilitation efforts pursuant to La.R.S. 23:1226. This appeal by Vicknair followed.
ISSUE
On appeal, Vicknair argues that the workers’ compensation judge erred in finding that the surgery recommended by Dr. McKay was not necessary, but that the vocational rehabilitation/functional evaluation was necessary.
LAW
La.R.S. 23:1203(A) mandates that an “employer shall furnish all necessary medical, surgical, and hospital services, and medicines, or any nonmedical treatment recognized by the laws of this state as legal.” To establish a claim for medical *639 benefits, an employee must show, to a reasonable certainty and by a ^preponderance of the evidence, that the benefits are occasioned by the work-related accident and are necessary. Alleman v. Fruit of the Loom-Crowley, 96-1246 (La.App. 3 Cir. 3/5/97); 692 So.2d 485.
The workers’ compensation judge’s finding as to whether a particular medical treatment is necessary is factual in nature and will not be disturbed on review in the absence of manifest error or unless it is clearly wrong. Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94); 630 So.2d 733. This standard of review is well established. Although the testimony of the treating physician should ordinarily be afforded more weight than a physician who merely conducts an examination, the opinion of a court-appointed independent medical examiner is treated as prima facie evidence. Jones v. Universal Fabricators, 99-1370 (La.App. 3 Cir. 2/9/00); 758 So.2d 856, writ denied, 00-0742 (La.5/12/00); 762 So.2d 13; Spell v. Conn Appliances Inc., 97-309 (La.App. 3 Cir. 10/8/97); 702 So.2d 797.
The workers’ compensation judge was presented with two views of evidence pertaining to the necessity for surgery. Dr. McKay and Vicknair both stated that surgery was necessary, while four other doctors all stated that it was not. The workers’ compensation judge also had the benefit of a psychological evaluation by Dr. Thomas Hannie and the FCE report. Accordingly, her decision finding that surgery was neither reasonable nor necessary cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Dr. McKay initially examined Vick-nair on November 7, 1997. After examining a June 30, 1997 CT scan of the lumbar spine, which revealed a central disc bulge at the L4-5 and L5-S1 disc levels, along with narrowing of the neural foramina, |4he diagnosed Vicknair as suffering from a collapsed disc at L4-5. When Vicknair refused an epidural steroid injection, Dr. McKay ordered physical therapy, which failed to help. A May 19, 1998 lumbar myelogram revealed a mild to moderate disc bulge primarily central in position at L4-5. A post-myelogram lumbar spine CT scan revealed a moderate concentric and central disc bulge with bilateral neural for-aminal narrowing at L4-5 and a mild central disc bulge at L5-S1. On June 29, 1998, Dr. McKay recommended that Vicknair undergo surgery.
On September 11, 1998, Dr. McKay diagnosed Vicknair as suffering from degenerative disc syndrome. He still recommended surgery. On October 19, 98, he placed Vicknair’s percentage of whole body and pain disability at 25%. A March 30, 1999 EMG and nerve conduction test performed on the left lower extremity was normal. Dr. McKay still recommended surgery for Vicknair on February 5, 2001.
Vicknair testified that he suffers from swelling in his lower left side, pressure against his spine, throbbing and burning pain in his lower back, problems with his left knee and the toes on his left foot, and spasm and numbness in his left leg and calf. He stated that he has trouble walking and bending, and he is no longer able to work in his yard, garden, raise animals, fish, work on cars, or work around his house. He stated that he does very little cooking or cleaning because of the pain. Vicknair testified that he watches television, walks in the yard with his dog, and visits his brother once or twice a week. He stated that he only sleeps three to four hours a night due to pain, and that he has trouble getting dressed and getting out of the bath tub, out of bed, or off the couch because he cannot bend. Vicknair testified that he|swould like to go back to work, but that he does not feel he can go back now *640 because of the pain. He stated that he wants to have surgery if it will relieve his pain.
Dr. Gregory Gidman evaluated Vieknair on August 21, 1996, but only recommended nonoperative treatment. He reevaluated Vieknair again on July 1, 1998, and determined that he would best be treated with nonoperative management since he was over two years post injury and exhibited chronic lower back pain. He opined that Vieknair was at medical maximum improvement and had a whole body impairment rating of 5%. Dr. Gidman recommended that Vieknair undergo a FCE with validity testing to determine His functional level and then vocational rehabilitation to return him to the workforce within his limitations.
Dr. Frazer Gaar, an orthopedic surgeon, performed an Independent Medical Examination on Vieknair at the order of the Office of Workers’ Compensation. In his report of February 24, 1999, Dr. Gaar notes that he treated Vieknair for a lumbar strain in 1982, and his associate treated him for lumbar strain in 1994, at which time an MRI revealed degenerative disc disease at L4-5. After examining Vieknair and reviewing his diagnostic tests and medical records, Dr. Gaar opined that he was not a good surgical candidate. He noted multiple signs of non-physiologic pain behavior along with four of five Wad-dells signs on clinical examination. Although the scans showed preexisting degenerative lumbar disc disease, more at L4-5, Dr. Gaar found no appearance of neural impingement in either the studies or on examination.
Dr. Gaar recommended an EMG and nerve conduction studies of the lower extremities to determine if there was any type of neural involvement, | ^suggesting that he might recommend surgery if such involvement was found. Otherwise, he recommended Vieknair undergo nonsurgi-eal treatment. He further agreed to an FCE, which he expected would be within the sedentary to light duty range. Dr. Gaar opined that Vieknair was at maximum medical improvement, pending the outcome of the EMG studies. The EMG and nerve conduction tests, which were performed by Dr. James Domingue, were normal.
In his deposition, Dr. Gaar stated that Vieknair had reached a plateau, but was not a surgical candidate. He felt that he would be able to go back to some type of work if he was cooperative and would do the FCE. If he would not cooperate, then Dr. Gaar would place him in the sedentary to light duty range. He diagnosed Viek-nair as suffering from back pain, unexplained origin, with preexisting degenerative lumbar disc disease.
Dr. Jack Hurst, a neurosurgeon, examined Vieknair at the request of Yoo Hoo on November 15, 2000. Finding no focal motor or lateralizing neurologic signs or deficits and positive evidence of nonorganic pain behavior, he recommended against Vieknair undergoing surgery. Dr. Hurst stated that many of the findings on examination invalidated Vicknair’s complaints as being functional.
Dr. Randall Lea, an orthopedic surgeon, performed a second medical examination of Vieknair on November 29, 2000. After obtaining a history, examining Vieknair, and reviewing the x-rays and diagnostic tests, Dr. Lea’s impression was that he was suffering from symptomatic lumbar spondylosis. He recommended against surgery for three reasons. First, he did not feel that Vicknair’s findings were that strong in terms of “a one to one match on the CT myelogram and |7MRI studies.” Although he felt that the MRI revealed degenerative disc disease and spondylitic changes at L4-5 and L5-S1, he did not *641 feel that they were to the extent that surgery would be required instead of conservative measures. Next, Dr. Lea did not think that surgery would provide long term relief for Vicknair’s symptoms. Finally, he was worried that Vicknair exhibited a “skewed pain profile.” Although he did believe that Vicknair had a pathology at L4-5 and L5-S1 and a legitimate basis for pain, he did not feel that his skewed physical findings were explainable based on the diagnostic studies. Dr. Lea felt that Vicknair exhibited somewhat of an over dramatic pain response. He stated that individuals with this type of pain profile usually do not improve after undergoing a major surgical procedure which does not have uniformly good outcome even with the best candidates. He was further concerned that Vicknair smokes.
Dr. Lea placed Vicknair within the sedentary work range, and stated that he would be capable of no more than four hours a day, four days per week. He further stated that he had reached maximum medical improvement at approximately eighteen months post-injury, and gave him a whole body impairment rating of 7%.
Dr. Thomas Hannie, a clinical psychologist, evaluated Vicknair on October 6, 1999 and December 1, 1999. He opined that Vicknair was neither motivated to diminish his pain nor return to work and that he grossly exaggerated his complaints of pain. He testified that Vicknair exhibited a passive aggressive, obstructive attitude by his failure to appear for his first appointment and then by walking out of his October 6th appointment before it was completed. Dr. Hannie felt that Vicknair worked very hard to avoid being evaluated and that he would | ^consciously plan to defeat any attempt to rehabilitate him. He stated that he did not see Vicknair as having any desire to change his situation in which he is taken care of financially without having to work.
Although some of the tests administered in the evaluation revealed that Vicknair had indications of being depressed, Dr. Hannie did not feel that the depression in and of itself was disabling, or that it was combining with something else to disable Vicknair. The tests further revealed that hysteria was indicated. Dr. Hannie defined hysteria as the tendency to act as if there is pain or a lack of ability to do things when that ability or inability is not there.
Dr. Hannie felt that Vicknair’s lack of cooperation, commitment, and resistance to the evaluation were significant problems. He felt that Vicknair is a very unsophisticated person, who would be unwilling to understand that there are psychological variables occurring which have an effect on his pain or his situation. Nor did he feel that Vicknair would be willing to participate in psychotherapy. Dr. Han-nie recommended that Vicknair undergo an FCE, even though he felt that Vicknair would magnify his symptoms and fail to put forth maximal effort. He did suggest putting him on a work-hardening program.
Considering the conflicting opinions with regard to the need for surgery, along with Dr. Hannie’s report and the results of the FCE, we cannot say that the workers’ compensation judge erred in determining that the surgery was neither necessary nor reasonable. Accordingly, the judgment denying Vicknair’s request for surgery is affirmed. We further find that judgment ordering Vicknair to submit to vocational rehabilitation was reasonable.
| ^CONCLUSION
For the foregoing reasons, the judgment of the workers’ compensation judge is affirmed. The costs of this appeal are as *642 sessed to the defendant-appellant, Harry Vicknair.
AFFIRMED.